1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ROBERT EUGENE TAYLOR,**<br><br>      **Petitioner,**<br><br>  **vs.**<br><br>**T. McDONALD, WARDEN,**<br><br>      **Respondent.** | Civil No.  10-cv-0177-MMA(BGS)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE PETITION FOR WRIT OF HABEAS CORPUS** |

   State prisoner Robert Eugene Taylor ("Taylor"), proceeding *pro se* with a Petition For Writ Of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition"), seeks relief from his June 2005 petty theft convictions in San Diego County Superior Court Case No. SCN 190742 and from his prison sentence of twenty-one years, four months.  Respondent concedes Taylor has exhausted the four grounds he presents for federal relief:  ineffective assistance of counsel;  use of perjured trial testimony;  instructional error;  and sentencing error.  Respondent filed an Answer.  (Dkt No. 4.)  Taylor filed no Traverse.  In consideration of the parties' filings, the lodged record, and controlling legal authority, and for the reasons discussed below, it is recommended the Petition be **DENIED**.

**I.  BACKGROUND**

   In a May 31, 2005 Amended Information, Taylor was charged with nine CAL. PENAL CODE § 484 felony counts of petty theft.  Eight of the nine counts alleged Taylor stole gasoline from his employer on specific dates in November and December 2004 through unauthorized charges on a gas card.  (Lodg. 1, CT Vol. 1, pp. 11-15.)  The ninth count alleged theft of company property found in

Taylor's vehicle.  (Id., pp. 10-11; see Lodg. 18, RT Vol. 1, 104:3-105:3, 112:14-114:15.).)  Each count carried Special Allegations under CAL. PENAL CODE §§ 666 (statutorily increasing the punishment for petty theft convictions if the person has been previously convicted of certain offenses) and 12022.1(b).  (Lodg. 1, CT Vol. 1, pp. 10-11.)  Taylor waived trial of the Section 12022.1(b) enhancements before his jury was empaneled, admitting that he was out of custody on bail in another criminal matter at the time of the charged theft offenses.[1]  (Lodg. 18, RT Vol. 1, 12:15-20.)  The Amended Information also enumerated six prison priors between 1989 and 2000 (two for burglary, one for forgery, one for a theft crime, an attempted murder in 1995, and possession of a controlled substance in 2000).  (Lodg. 1, CT Vol. 1, pp. 16-17.)  The attempted murder conviction qualified as a strike prior.  (Id., p. 18.)

Federal habeas courts presume the correctness of "a determination of a factual issue made by a State court."  28 U.S.C. § 2254(e)(1).  The January 14, 2008 Court of Appeal decision denying Taylor's direct appeal summarizes the underlying facts and evidence.  (Lodg. 7.)

> On October 5, 2004, Taylor began working as a quarryman for National Quarries (National).  Taylor, along with two other quarrymen, Raymond Barnhart and Abel [Garcia] Lara [], worked under the supervision of Lenvel Barzee, National's operations manager.
>
> National had an account with Shuster Oil (Shuster) for the purchase of gas.  Shuster issued credit card sized cards to National, which could be used to pay for gas at Shuster's gas stations.  Shuster would then bill National on a bimonthly basis, for purchases made with the cards.  Neither Taylor, Barnhart, nor Lara were authorized to purchase gas from Shuster using the cards issued to National.
>
> Jenee Quiram was the office manager for National.  Quiram had worked for National since 2000.  During that time period, she was aware of only two Shuster gas cards that had been issued to National, both of which Barzee kept in his possession.  In a Shuster account statement that Quiram received on approximately December 6, 2004, Quiram discovered that several purchases had been made on a third gas card, the existence of which she had been previously unaware.  The purchases were made on various dates in late November.  The card had been issued to a previous owner of National, who sold the company in January 2000.  The next Shuster statement reflected three additional purchases charged to the gas card in question on December 2.

---

[1] Taylor was out of custody on bail in a domestic violence matter, Case No. CN173370.  It was agreed the domestic violence matter would trail the theft case.  (Lodg. 18, RT Vol. 1, 1:4-20; see Lodg. 18, RT Vol. 2, 184:25-185:10.)  On March 23, 2006, he was sentenced in both the theft case and to a stipulated four-year sentence in the domestic violence matter to which he pled guilty.  (Lodg. 18, RT Vol. V, 551:6-19; Lodg. 18, RT Vol. 6, 768:14-769:1, 752:1-755:1.)

2

Upon investigating the purchases, Barzee learned that Barnhart had previously seen a gas card in the glove compartment of a truck owned by National. Barnhart left the gas card in the glove compartment of the truck. Quiram subsequently viewed surveillance video of Shuster's gas pumps, which Shuster provided. The video showed Taylor using the gas card to make purchases.

Taylor used the card to purchase fuel for his own truck as well as for other vehicles, including Lara's van. Lara said that he had given Taylor cash on three occasions, and that Taylor filled Lara's van with gas using the Shuster gas card. Taylor told Lara that he had obtained the card from a previous employer.

The last unauthorized purchase occurred on December 2. The last day that Taylor showed up for work at National was December 3.

(Lodg. 7, pp. 3-4; *see* Lodg. 18, RT Vol. 1, 65:14-24, 99:7-23, 102:27-103:1.)

Taylor testified on his own behalf at his three-day trial. (Lodg. 1, CT Vol. 2, pp. 253-261; Lodg. 18, RT Vol. 2, pp. 198-241.) As summarized by the Court of Appeal:

Taylor admitted having suffered many prior convictions and having been incarcerated a number of times.[2] Taylor also admitted that he had used the Shuster gas card to purchase gasoline. Taylor stated that Barnhart had given him the gas card in exchange for methamphetamine, and said that Barnhart had told Taylor on several occasions that Barnhart was the owner of the gas card. (FN 4: Barnhart and Lara testified that they had used methamphetamine with Taylor on only one occasion, at Taylor's residence. Barnhart denied having given Taylor the gas card or having ever asked Taylor for methamphetamine, apart from the single occasion at Taylor's residence.) Taylor denied that he had told Lara that he had obtained the card from his previous employer. [¶] Taylor's wife, Victoria, testified that Barnhart had come to Taylor's room on four or five occasions to obtain methamphetamine.

(Lodg. 7, pp. 4-5.)

In addition to the Shuster and National prosecution witnesses, the evidence included surveillance videotape showing Taylor getting gas for various vehicles using the Shuster card. The total amount of money involved was $441.11. (Lodg. 18, Vol. 6, 756:26-27.) Taylor freely admitted his identity and conduct at the gas pumps as captured on the videotape, as well as each transaction amount. His defense theory was that Barnhart had given him the gas card as if it were his own for Taylor to hold as collateral for drug debts, and they ultimately made a deal that Taylor could use the

---

[2] Taylor admitted all the prior convictions presented to the jury through a prison administrator witness (Lodg. 18, Vol. 2, pp. 87-197) and admitted he had "been in prison several times" (Id., 199:8-15).

dollar value remaining on the card to satisfy Barnhart's share of debt for drug purchases.  Taylor testified that he, Barnhart, and Garcia had started purchasing drugs together about two or three weeks after he started work at National in October 2004.  (Lodg. 18, Vol. 2, pp. 199-207.)  According to Taylor, the three pooled their money for the purchases after discussing the idea at Taylor's motel room residence one day.  (Id., pp. 207-210.)  Taylor testified he stopped using drugs at work after about two months because, as a parolee, he was subject to drug testing, but admitted he continued to use drugs at home (Id., 235:6-17), and testified he continued to obtain methamphetamine for the other two "almost daily," for which they paid him cash  (Id. pp. 210-212).  He stated the two men came to his room ten or twelve times, contrary to Barnhart's and Garcia's testimony.  (Id., p. 211.)

Taylor testified there came a time when Barnhart and Garcia could not pay him for the drugs they wanted him to continue buying.  (Lodg. 18, RT Vol. 2, p. 212.)  He said he asked Barnhart for collateral when Barnhart wanted another transaction while still owing money for prior transactions. (Id., 214:6-11.)  Barnhart proposed a gas card he said was prepaid, with between $200 and $400 on it.  "I asked him was it his, and he said yes." (Id., 214:13-17.)  Barnhart brought him the card the next day, "with the agreement he would pay me back and I wouldn't use it," and Taylor took it as collateral for the approximately $150 Barnhart then owed him.  Taylor testified the card was of a type he had not seen before, with punched holes, like the trial exhibit identified by prosecution witnesses as a Shuster card issued to National for fuel purchases.  He also testified he did not know how National got fuel for its trucks.  (Id., 214:19-216:7.)

Taylor testified he kept the card at his motel room unused for about a month, telling only his wife about it when she was going to throw it away, until two pay periods had passed without Barnhart paying his debt.  Taylor approached him because he needed the money. (Lodg. 18, RT Vol. 2, 216:14-217:6.)  Barnhart told him he didn't have the money, but if Taylor got him a certain quantity of methamphetamine, he would let Taylor keep and use the card.  Taylor said he asked Barnhart again whether the card was his, and he said it was.  (Id., 217:5-218:2.)  They struck the deal, Taylor got him the drugs, and then began to use the gas card.  (Id., 218:12-20.)  He did not verify the amount on the card but just decided to use it until it ran out, selling gas to friends to get some money on the side. (Id., 218:21-219:19.)  He said he knew about the cameras at the gas station and never tried to conceal

1  his identity because he didn't think he was doing anything wrong or illegal. (Id., 219:20-220:9.) He

2  knew his conduct in helping others get drugs in exchange for payment was against the law, but never

3  thought he was stealing from his employer. (Id., 220:10-28.)

4        Taylor said Barnhart testified falsely when he denied he gave Taylor the card. (Lodg. 18, RT

5  Vol. 2, 231:3-18.) Also contrary to Barnhart's testimony, Taylor testified that after he accepted the

6  card, Barnhart would call him at home and on his cell phone "every morning," five or six days a week,

7  to get more drugs. (Id., 221:1-11.) He said Barnhart lied when he testified that he went to Taylor's

8  motel room only one time and never called him. (Id., 221:12-26.) Taylor testified he had asked his

9  attorney to subpoena cell phone records to substantiate his representations about the frequency of

10 Barnhart's calls, but that evidence was not produced at trial. (Id., 234:13-235:5.)

11       On cross examination, Taylor admitted each of six prior convictions, the prison terms he had

12 served, and parole violations severally associated with those. (Lodg. 18, RT Vol. 2, pp. 222-225.)

13 He admitted his prior burglary convictions were for thefts from vehicles. (Id., 231:19-21.)   He

14 confirmed three of the videotaped purchases were for gas he had sold to Garcia. (Id., pp. 226-229.)

15 However, he denied he told Garcia the card he was using came from a former employer, contrary to

16 Garcia's testimony. (Id., 229:17-25.) Taylor also contradicted Garcia's testimony that he and Barnhart

17 had come to Taylor's motel room only once, that he did not owe Taylor any money, and that he did

18 not bring drugs to the work site. (Id., 229:26-231:2.)

19       Taylor's wife testified for the defense. (Lodg.  18, RT Vol. 2, pp. 251-278.)  She stated

20 Barnhart would call the room or her cell phone to reach Taylor early every morning during the week

21 to get methamphetamine. (Id., 254:26-257:24.) On cross examination, she admitted she had not told

22 anyone about the phone calls or the gas card until a defense investigator asked her about them shortly

23 before trial. (Id., 268:7- 269:2.) She identified the trial exhibit gas card with punched holes as like

24 the one she found in their room, but the card Taylor had bore the words "Pacific Pride." (Id., 258:8-

25 259:18, 24-28.)  When she saw it in their room, she was concerned the card might be stolen, and was

26 suspicious when Taylor would not at first tell her where he got it. (Id., pp. 260-262.) She testified

27 when she went with him to the gas station, she knew he was doing something wrong by using the card.

28 (Id., 271:15-26.) She characterized both of them as drug addicts. (Id., 272:27.) She stated she was

10cv0177

1  on disability and took "psych meds" for certain diagnosed conditions. (<u>Id.</u>, 275:16-25.)  The jury was

2  permitted to hear about a domestic violence incident when Taylor beat her up in front of a motel room

3  in January 2004. (<u>Id.</u>, 276:20-277:17.)

4  In his closing argument, the prosecutor emphasized the surveillance video removes any

5  "dispute about who was on there, what was done." (Lodg. 18, RT Vol. 2, 296:26-28.)  As part of the

6  jury charge before counsels' summations, the court had given an "Ignorance Or Mistake Of Fact"

7  instruction. (<u>Id.</u>, 289:20-290:2.)  Ignorance or mistake of fact, if proven, could disprove the criminal

8  intent necessary for the theft convictions.  The prosecutor singled out that instruction, the "defense

9  theory in the case," urging the jury to find "it's not true," "it's not reasonable," and "its not a defense."

10  (<u>Id.</u>, 300:14-23, pp. 301-303.)  The prosecutor urged the jury to find Taylor had no "good faith belief"

11  he had the right to use the gas card, based on: his wife's testimony he did not want to talk about the

12  card, he was hiding it and was evasive about it; Garcia's testimony Taylor told him the card came from

13  his former employer, a statement he would not have made if he had a good faith belief he could

14  lawfully use the card; and Barnhart's not being "the owner" who was authorized to give Taylor

15  permission to use the card, a circumstance the prosecutor represented Taylor knew. (<u>Id.</u>, 303:7-18.)

16  He also reminded the jury Taylor stole not only gasoline, but also the granite pieces and jumper cables

17  charged in count nine (<u>Id.</u>, 304:1-10), and he admitted his several prior criminal convictions and prison

18  terms (<u>Id.</u>, 297:9-16, 299:1-23).

19  Defense counsel argued that if Taylor were making up a false story to explain away the alleged

20  thefts, he would not be likely to incriminate himself with admissions of drug sales and risk alienating

21  the jury. (Lodg. 18, RT Vol. 2, 309:5-24: "it's drugs because that's what was going on.")  He noted

22  that both Barnhart and Garcia had testified at trial in front of their employer and argued they

23  collaborated to get as close to the truth "as they could without incriminating themselves" and losing

24  their jobs. (<u>Id.</u>, 310:1-28.)  Counsel reminded the jury Barnhart and Garcia both testified they had

25  seen the gas card in the truck glove compartment. (<u>Id.</u>, 311:6-24.)  He also emphasized the specific

26  intent required for a theft conviction. (<u>Id.</u>, 312:28-313:218.)

27  In rebuttal, the prosecutor argued Barnhart and Garcia made "a big mistake going to the

28  defendant's house" and smoking methamphetamine there, but it was "just that one time," pointing out

that of the three men, only Taylor had prior felony convictions.  (Lodg. 18, RT Vol. 2, 314:2-20.)  He argued Taylor drove the same company truck as Barnhart and had the same access to the card, and "you only see [unauthorized charges] after the defendant gets his hands on it."  (Id., 315:11-15.)  He suggested Taylor was "lying" when he said he knew the surveillance camera was there:  "That's part of the story. . . . He did the crime and his defense is unreasonable."  (Id., 315:22-28.)

The jury deliberated less than the equivalent of one day before convicting Taylor on June 3, 2005, of all counts and finding true all the charged priors and enhancements.  Before reaching verdicts, they had requested and received read-backs of the testimony of Taylor, Barnhart, and Garcia.  (Lodg. 18, RT Vol. 3, pp. 323-332; Lodg. 1, CT Vol. 2, pp. 261, 271-289.)  After appointment of substitute defense counsel and before sentencing (see Lodg. 18, RT Vol. 4), Taylor moved unsuccessfully for a new trial on grounds of insufficient evidence and discovery of new evidence.[3] (Lodg. 1, CT Vol. 2, pp. 178-181, 298; see Lodg. 18, RT Vol. V.)  On March 23, 2006, the court sentenced Taylor to consecutive prison terms totaling 21 years, four months.  (Lodg. 18, RT Vol. 6.)

Taylor appealed his conviction and sentence on grounds:  (1) the trial court erred in refusing to give defense counsel's proposed version of a mistake of fact jury instruction "and/or misinstructing the jury on whether appellant had to believe the card belonged to National Quarries to avail himself of the mistake-of-fact defense;" and (2) whether the imposition of consecutive determinate sentences in reliance on the court's finding "the crimes were independent and planned" and "the appellant took advantage of a position of trust" violated Taylor's right to a jury trial and due process under Cunningham v. California, 549 U.S. 270 (2007), Blakely v. Washington, 542 U.S. 296 (2004), and Apprendi v. New Jersey, 530 U.S. 466 (2000).  (Lodg. 2.)  By Order entered January 15, 2008, the Court of Appeal affirmed the judgment in a 16-page reasoned decision. (Lodg. 7.)  Taylor's Petition For Review by the California Supreme Court was summarily denied on April 9, 2008.  (Lodgs. 8, 9.)

Proceeding pro se thereafter, Taylor filed a habeas petition in San Diego County Superior

---

[3]   The "new evidence" ultimately consisted only of telephone records.  Taylor does not support with citation to the record his representation that evidence of Barnhart's drug use was also produced in connection with the new trial motion.  In addition, a post-trial letter proffered in support of the motion, purportedly written by Garcia and stating both he and Barnhart committed perjury at trial, was rejected when the letter's authenticity was impugned.  (Lodg. 1, 2 CT 186-213; Lodg. 18, RT Vol. V, pp. 552, 554.)

Court asserting:  (1) he received ineffective assistance of counsel ("IAC") for his attorney's failure to request a continuance until subpoenaed cell phone records could be obtained to impeach Barnhart's trial testimony, also couched as a failure to conduct an adequate investigation to ensure those records would be available for trial; and (2) his fair trial rights were violated when the court denied his Motion For New Trial and allowed Barnhart's allegedly perjured testimony to stand, despite the impeaching telephone records and other evidence Taylor had proffered in support of the motion.  (Lodg. 10, pp. 3-4.)  By Order entered October 16, 2008, the Superior Court denied the petition.  (Lodg. 11.)  Taylor filed two habeas petitions in the Court of Appeal, asserting the same two grounds for relief.  (Lodg. Nos. 12-14.)  The Court of Appeal denied relief on grounds of procedural default and failure to demonstrate prejudice, citing Strickland v. Washington, 466 U.S. 668 (1984).  (Lodg. 15.)  The California Supreme Court summarily denied Taylor's subsequent habeas petition asserting the same two grounds.  (Lodg. Nos. 16-17.)

Taylor's federal Petition presents the two claims he raised on direct appeal (*i.e.*, instructional and consecutive sentencing errors in violation of his federal due process and jury trial rights) and  the two claims he raised in his state habeas petitions (*i.e.*, a Sixth Amendment IAC claim and a perjured testimony challenge to the fairness of his trial).  Respondent contends the deference federal habeas courts must accord to state court decisions and  the procedural default doctrine require that the Petition be denied.  (Dkt No. 4, 2:12-15.)

**II.     DISCUSSION**

**A.     Legal Standards For Federal Habeas Relief**

A federal court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.A. § 2254(a).  Federal habeas courts are bound by a state's interpretation of its own law.  Estelle v. McGuire, 502 U.S. 62, 68 (1991) (federal courts may not "reexamine state-court determinations on state-law questions"); Jackson v. Ylst, 921 F.2d  882, 885 (9th Cir. 1990) (federal courts "have no authority to review a state's application of its own laws").

Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA").  *See* Lindh v. Murphy, 521 U.S. 320, 322-23 (1997). AEDPA establishes a " 'highly deferential standard for evaluating state-court rulings,' " requiring "that state-court decisions be given the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002), *quoting* Lindh, 521 U.S. at 333 n.7.  The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  Federal habeas relief is warranted only if the result of a claim adjudicated on the merits by a state court "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States,"[4] or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see* Bell v. Cone, 535 U.S. 685, 694 (2002).  A decision is "contrary to" federal law if (1) it applies a rule that contradicts governing Supreme Court authority, or (2) it "confronts a set of facts that are materially indistinguishable from" a Supreme Court decision but reaches a different result.  Early v. Packer, 537 U.S. 3, 8 (2002) (citations omitted).  To be found "unreasonable," the application of the precedent "must have been more than incorrect or erroneous;" it "must have been 'objectively unreasonable.' " Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citation omitted); *see* Middleton v. McNeil, 541 U.S. 433, 436 (2004).  A federal court applies AEDPA standards to the "last reasoned decision" by a state court.  Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005); *see* Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim rest upon the same ground").

## B.    Petition Grounds One And Two Are Procedurally Defaulted

Taylor contends in Ground One his trial counsel was unconstitutionally ineffective for failing "to request a continuance to receive subpoenaed telephone records," resulting in a "failure to present relevant impeachment evidence," because "the telephone records would have afford[ed] the jury sufficient weight in petitioner innocence or guilt [*sic*]."  (Dkt No. 1, p. 6 (punctuation omitted).)  He contends in Ground Two those failures afforded "the state the opportunity to use perjured testimony

---

[4] Federal courts may look to circuit precedent in determining what law is "clearly established" and, as with any precedent, this Court must follow Ninth Circuit case law.  *See* Byrd v. Lewis, 566 F.3d 858, 860 n.5 (9th Cir. 2009), *citing* Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 2000) *and* Marshall v. Taylor, 395 F.3d 1058, 1061 and n.15 (9th Cir. 2005).

of prosecution witness Barnhart."  (Id.)  Respondent argues federal review of the Ground One IAC claim is procedurally barred, as is his Ground Two claim of perjured testimony, characterizing the latter claim as merely a restatement of the first.  (Lodg. 5-1.)

In its one-page decision denying Taylor habeas relief, the Court of Appeal rejected both his IAC and perjured testimony claims on grounds he "could have raised his contentions on direct appeal," but he did not do so (Lodg. 15), citing In re Clark, 5 Cal.4th 750 (1993).  The Court of Appeal also found he "fail[ed] to state a prima facie case for relief" on his IAC and perjured testimony claims because he "failed to demonstrate prejudice," citing Strickland, 466 U.S. 668 and People v. Duvall, 9 Cal.4th 464, 474 (1995) (a habeas petitioner must plead and prove sufficient grounds for relief).  (Id.)

> Petitioner contends a witness provided perjured testimony, and counsel was ineffective for failing to request a continuance to discover this perjury through telephone records.
>
> Petitioner's attorney was replaced by private conflicts counsel, and that attorney presented the records and the perjury claim in a motion for new trial.  Petitioner therefore could have raised his contentions on direct appeal.  (In re Clark (1993) 5 Cal.4th 750, 765, 767-768, 783.)  Moreover, petitioner has failed to demonstrate prejudice.  (Strickland v. Washington (1984) 466 U.S. 668, 687, 690-691.)  Petitioner therefore fails to state a prima facie case for relief.  (People v. Duvall (1995) 9 Cal.4th 464, 474.)

(Lodg. 15.)

"Federal courts will not generally review a question of federal law decided by a state court if its decision rests on a state law ground that is independent of the federal question and adequate to support the judgment."  King v. LaMarque, 464 F.3d 963, 965 (9th Cir. 2006); Beard v. Kindler, -- U.S. --, 130 S.Ct. 612, 614 (2009) (same).  "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits.  See Wainwright v. Sykes, 433 U.S. 72,

87-91, 81-82, 90 (1977); *see also* <u>Coleman</u>, 501 U.S. at 750.

\\

In California, habeas petitioners may have their claims denied as untimely if they "substantially delay" presenting them without justification. <u>Clark</u>, 5 Cal.4th at 765, n.5; <u>In re Robbins</u>, 18 Cal. 4th 770, 780 (1998). The Ninth Circuit "has recognized that California's untimeliness rule became independent of federal law in 1998" with the <u>Robbins</u> decision, explicitly holding that California courts would no longer consider the federal constitutional merits of a state habeas petition when enforcing the state's untimeliness bar.[5] <u>Bennett v. Mueller</u>, 322 F.3d 573, 581-83 (9th Cir. 2003). The "adequacy" of that state procedural bar was less clear until the very recent United States Supreme Court opinion in <u>Walker v. Martin</u> -- S.Ct.--, 2011 WL 611627 (U.S. Feb. 23, 2011). The United States Supreme Court has answered in the affirmative the question: "Does California's timeliness requirement qualify as an independent state ground adequate to bar habeas corpus relief in federal court?" <u>Martin</u>, 2011 WL 611627 at *3. No party to the <u>Martin</u> case disputed that California's untimeliness rule is an "independent" state ground; rather, the Court was presented with the question of the "adequacy" of "California's practice under which a prisoner may be barred from collaterally attacking his conviction when he has 'substantially delayed' filing his habeas petition." <u>Id.</u> at *6. The Court held California's untimeliness rule is "adequate" for procedural default purposes when the petitioner subsequently presents for federal habeas relief the same claims that were rejected on untimeliness grounds in state court. <u>Id.</u> at *6, *10 (reversing a Ninth Circuit determination that the California untimeliness bar of <u>Clark</u> and <u>Robbins</u> was not "adequate" because it was not firmly defined or consistently applied). "California courts signal that a habeas petition is denied as untimely by citing

---

[5] In <u>Robbins</u>, the California Supreme Court "recognized that, when reviewing state habeas petitions for the untimeliness ground embodied in *Clark* (as well as for distinct procedural grounds embodied in *Ex Parte Dixon*, 41 Cal. 2d 756, 759 (Cal. 1953) and *In re Harris*, 5 Cal.4th 813 (Cal. 1993)), California courts previously considered the federal constitutional merits of the petitions in determining whether the petitions qualified for an exception to the rule of procedural default." <u>Bennett</u>, 322 F.3d at 581-82; *see* <u>Robbins</u>, 18 Cal.4th at 812 n.32. "The court then declared, however, that henceforth in California courts would no longer determine whether an error alleged in a state petition constituted a federal constitutional violation: '[W]e shall assume, for the purpose of addressing the procedural issue, that a federal constitutional error is stated, and we shall find the exception inapposite if, based upon our application of state law, it cannot be said that the asserted error "led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner." ' " <u>Id.</u>, *quoting* <u>Robbins</u>, 18 Cal.4th at 811-12 (*quoting* <u>Clark</u>, 5 Cal.4th at 797).

the controlling decisions, *i.e.*, *Clark* and *Robbins*." Id. at *3, *5 ("A summary denial citing *Clark* and *Robbins* means that the petition is rejected as untimely"). To be relieved of that default of his federal claims pursuant to an independent and adequate state-law rule, a state prisoner would need to establish "cause" for the delay in asserting the claims and actual "prejudice" from the state's alleged violation of his constitutional rights.[6] *See* Martin, 2011 WL 611627 at *6.

The Martin Court also found the California courts are not applying the untimeliness rule arbitrarily because they "have discretion . . . to by-pass a timeliness issue and, instead, summarily reject the petition for want of merit," that is, they may decide a claim on the merits notwithstanding the possible applicability of an untimeliness rule without the application being found arbitrary. Martin, 2011 WL 611627 at *5. "[A] state procedural bar may count as an adequate and independent ground for denying a federal habeas petition even if the state court had discretion to reach the merits despite the default." Martin, 2011 WL 611627 at *4, *citing* Kindler, 130 S.Ct. 612;

The Court of Appeal's citations to Strickland and Duvall suggest it also reached the merits of Taylor's claims in denying him habeas relief. "A state court's application of a procedural rule is not undermined where, as here, the state court simultaneously rejects the merits of the claim." Bennett, 322 F.3d at 580. Even if it is unclear whether a particular summary denial of delayed claims is on the merits or as procedurally rejected for untimeliness, the Martin Court observed:

> We see no reason to reject California's time bar simply because a court may opt to bypass the *Clark* / *Robbins* assessment and summarily dismiss a petition on the merits, if that is the easier path. See, *e.g.*, *Strickland v. Washington*, 466 U.S. 668,697 (1984) ("[A] court need not determine whether counsel's performance was deficient . . . [i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of prejudice . . . ".)

Martin, 2011 WL 611627 at *8, *9 (parallel citation omitted) (also finding "there is no basis for

---

[6] The Clark "fundamental miscarriage of justice" exception to the procedural bar against successive or untimely petitions requires a demonstration: "(1) that error of constitutional magnitude led to a trial that was so fundamentally unfair that absent the error no reasonable judge or jury would have convicted the petitioner; (2) that the petitioner is actually innocent of the crime or crimes of which the petitioner was convicted; (3) [certain circumstances associated with the imposition of the death penalty]; (4) that the petitioner was convicted or sentenced under an invalid statute." Clark, 5 Cal.4th at 797-98. " 'Whenever we apply the first three *Clark* exceptions, we do so exclusively by reference to state law. When we apply the fourth *Clark* exception, we apply federal law in resolving any federal constitutional claim.' " Bennett, 322 F.3d at 582, *quoting* Robbins, 18 Cal.4th at 812 n.32.

1   concluding that California's untimeliness rule operates to the particular disadvantage of petitioners

2   asserting federal rights).

3        Taylor does not suggest that the untimeliness rule was applied in a discriminatory manner in

4   his case.  He did not attempt to show good cause for the delay in bringing the IAC and perjured

5   testimony claims or that his circumstances fall within any exception to the untimeliness bar, and he

6   has not challenged Respondent's procedural default argument in a Traverse.  Accordingly, it is

7   recommended federal habeas relief on Taylor's Petition Grounds One and Two be **DENIED** as barred

8   by California's independent and adequate state law untimeliness rule.  Martin, 2011 WL 611627.

9        Even if the Court were to reach the merits of a Strickland analysis because the Court of Appeal

10  cited that authority in denying Taylor habeas relief, the state court results should not be disturbed.  If

11  a claim was adjudicated on the merits, AEDPA standards must be applied even where the state court

12  did not issue a statement of reasoning.  *See* Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2002)

13  "Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision,

14  but an independent review of the record is required to determine whether the state court clearly erred

15  in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000);

16  *see* Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2003) (same).  Although the federal court

17  independently reviews the record, "we still defer to the state court's ultimate decision."  Pirtle, 313

18  F.3d at 1167; *see* Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009) (same.)

19              In Strickland, . . . we announced a two-part test for evaluating claims
                that a defendant's counsel performed so incompetently in his or her
20              representation of a defendant that the defendant's sentence or
                conviction should be reversed: . . . first, that counsel's "representation
21              fell below an objective standard of reasonableness," [Strickland,] 466
                U.S., at 688 . . .; and second, that "there is a reasonable probability that,
22              but for counsel's unprofessional errors, the result of the proceeding
                would have been different," id., at 694 . . . .

23  Bell, 535 U.S. at 694; *see* Strickland, 466 U.S. at 687 ("First, the defendant must show that counsel's

24  performance was deficient . . . .  Second, the defendant must show that the deficient performance

25  prejudiced the defense," that is, that "counsel's errors were so serious as to deprive the defendant of

26  a fair trial, a trial whose result is reliable"); *see* Harrington v. Richter,, -- U.S. --, 131 S.Ct. 770, 791

27  (Jan. 19, 2011) ("Representation is constitutionally ineffective only if it 'so undermined the proper

28

functioning of the adversarial process' that the defendant was denied a fair trial"), *quoting* Strickland, 466 U.S. at 686.

"The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Harrington, 131 S.Ct. at 788, 792 (citations omitted) (reversing a Ninth Circuit *en banc* opinion granting habeas relief on an IAC claim, concluding the state courts' decision on the merits of the claim "required more deference than it received" on federal habeas review because a habeas petitioner must do more than show he would have satisfied the Strickland test if the reviewing federal court were analyzing the claim in the first instance). "The likelihood of a different result must be substantial, not just conceivable." Id. at 791-92. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable," the required showing for federal habeas relief. Id. at 786.

> Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under [28 U.S.C.] § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington, 131 S.Ct. at 788 (citations omitted).

Concerning the deficient performance element of an IAC claim, "[t]he challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment,' " that is, "that 'counsel's representation fell below an objective standard of reasonableness.' " Harrington, 131 S.Ct. at 787, *quoting* Strickland, 466 U.S. at 687, 688. Counsel has a duty "adequately to investigate the defendant's 'most important defense' and to investigate and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict." Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2002) (citation omitted). "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.' " Harrington, 131 S.Ct. at 790, *quoting* Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (*per curiam*). If the Court reaches the merits of Taylor's IAC claim, applying the requisite degree of deference to the state courts' result, it is recommended the Court find Taylor has failed to establish his trial counsel's performance

1  was unconstitutionally deficient for proceeding to trial without the telephone records, inasmuch as

2  those documents had no direct bearing on Taylor's defense to the gas theft charges.

3       Concerning the prejudice element, "a challenger must demonstrate 'a reasonable probability

4  that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' "

5  Harrington, 131 S.Ct. at 787-88, *quoting* Strickland, 466 U.S. at 693, 687.  Even if counsel's

6  performance were found to be deficient, it is recommended any error be found  harmless.  Brecht v.

7  Abrahamson, 507 U.S. 619, 623, 637 (1993) (to satisfy the prejudice showing required for federal

8  habeas relief, the constitutional error must have "had substantial and injurious effect or influence in

9  determining the jury's verdict") (internal punctuation and citation omitted); *see* Baines v. Cambra, 204

10 F.3d 964, 977 (9th Cir. 2000) (the Ninth Circuit applies the Brecht harmless error standard in all 28

11 U.S.C. § 2254 independent reviews if constitutional error is found). "[I]t is not enough to convince

12 a federal habeas court that, in its independent judgment, the state-court decision applied Strickland

13 incorrectly," but rather the petitioner "must show that the [Court of Appeal] applied Strickland to the

14 facts of his case in an objectively unreasonable manner." Bell, 535 U.S. at 698-99 (citation omitted);

15 28 U.S.C. § 254(d).  Taylor attempts no such demonstration.

16      Taylor's counsel was defending him on nine petty theft counts.  The telephone records had no

17 exonerating effect with respect to that criminal conduct.  While the records had potential impeachment

18 relevance for Barnhart's testimony he never called Taylor, the records were not conclusive either to

19 disprove Barnhart's testimony or to demonstrate Taylor's factual innocence.  Even if the jury believed

20 Barnhart was the caller, the phone records do not reveal the subject matter of the conversations.  They

21 do not substantiate he incurred drug debts owed to Taylor for which he gave the gas card as collateral.

22 The jury heard the conflicting testimony, observed all the witnesses, and was charged with making

23 credibility findings to decide how Taylor came to have and use the gas card.  Taylor's own criminal

24 history likely undermined his credibility.  Ample evidence supports the verdicts.  Evidence is

25 sufficient to support a criminal conviction when "the record evidence could reasonably support the

26 finding f guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318 (1979).  Even if

27 defense counsel had requested and been granted a continuance until the subpoenaed telephone records

28

10cv0177

were available, and even had he used those records to impeach Barnhart's testimony on that point, Taylor has not shown any "reasonable probability . . . the result of the proceeding would have been different," or that the reliability of the resultant trial was undermined by the absence of that evidence. Strickland, 466 U.S. at 694, 687.

In Ground Two, Taylor contends his "due process rights were violated when the trial judge allowed the state to use the perjured testimony of prosecution witness (Raymond Barnhart)" despite the post-trial production of the telephone records purportedly substantiating the alleged perjury. (Dkt No. 1, p. 7.) As quoted above, the Court of Appeal denied him habeas relief on this claim, along with his IAC claim, for procedural default and no showing of prejudice, citing Clark, 5 Cal.4th 750, Strickland, 466 U.S. 668, and Duvall, 9Cal.4th 464. (Lodg. 15.) Taylor argues the"lik[li]hood of the perjured testimony affecting the jury was great," particularly "in light of the jury's requested read back" of testimony during deliberations substantiating that "the credibility of the witness was a[n] issue." (Dkt No. 1, p. 7.) However, the telephone records could reasonably contribute only theoretical support for a series of attenuated inferences the jury would necessarily have had to draw in order to acquit Taylor of the gas thefts, such as the calls were made by Barnhart personally to arrange drug deals for which he ultimately could not pay, Barnhart rather than Taylor took National's card, Barnhart misrepresented himself as the owner of the card when he gave it to Taylor, and Taylor believed Barnhart had the right to give it to him for his personal use. While "a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment" (Napue v. Illinois, 360 U.S. 264, 269 (1959)), this is not a case where a prosecutor knowingly presented false testimony to obtain the conviction, or where the trial court disregarded conclusive evidence of perjury in circumstances where a different outcome was likely if the new evidence had been before the jury. (See Lodg. 18, Vol. V, 555:26-557:4.) In consideration of the entire evidentiary record, Taylor's assertion of unconstitutional prejudice on this issue should meet the same fate as his IAC claim.

For all the foregoing reasons, it is recommended the Court find Taylor's Ground One and Ground Two claims are procedurally defaulted under California's independent and adequate

1   untimeliness bar.  <u>Martin</u>, 2011 WL 611627.  Even if Taylor had not procedurally defaulted these

2   claims, he has not "rebut[ted] the presumption of correctness by clear and convincing evidence" (28

3   U.S.C. § 2254(e)(1)) attaching to the state court finding Taylor "has failed to demonstrate prejudice"

4   associated with either claim.  Accordingly, habeas relief on Grounds One and Two should be

5   **<u>DENIED</u>**, as the state court result is not "contrary to, or involved an unreasonable application of

6   clearly established Federal law, . . . [nor is it] based on an unreasonable determination of the facts in

7   light of the evidence presented. . . ."  28 U.S.C. § 2254(d); *see* <u>Bell</u>, 535 U.S. at 694.

8          **C.      <u>Ground Three:  Instructional Error</u>**

9          Taylor contends the trial court's mistake of fact jury instruction deprived him of a fair trial

10  because the instruction purportedly misstates the law and because the court should not have rejected

11  counsel's proffered pinpoint language elaborating the defense theory.  (Dkt No. 1, p. 8; *see* Lodg. 2,

12  p. 22; Lodg. 8, p. 20).  "It is well established that a criminal defendant is entitled to adequate

13  instructions on the defense theory of the case."  <u>Conde v. Henry</u>, 198 F.3d 734, 739 (9th Cir.1999);

14  *see* <u>Bradley v. Duncan</u>, 315 F.3d 1091, 1098-99 (9th Cir. 2002) (a state court's failure to instruct the

15  jury on a defense theory may be found to have deprived the defendant of his due process right to

16  present a complete defense).  "As a general proposition, a defendant is entitled to an instruction as to

17  any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his

18  favor."  <u>Id</u>., *quoting* <u>Mathews v. United States</u>, 485 U.S. 58, 63 (1988).

19         However, AEDPA review standards require considerable deference to state court

20  determinations on instructional issues.  *See* <u>Waddington v. Sarausad</u>, 555 U.S. 179, 129 S.Ct. 823, 833

21  (2009) (applying AEDPA standards to hold that "[e]ven if the challenged jury instruction was

22  ambiguous, the [Ninth Circuit] still erred in finding the instruction was so ambiguous as to cause a

23  federal constitutional violation").  The <u>Waddington</u> Court also addressed a companion argument "that

24  the prosecutor's closing argument caused [the defendant's] jury to apply the instruction in a way that

25  relieved the State of its burden to prove every element of the crime beyond a reasonable doubt."  <u>Id</u>.

26  On the facts of that case, the Court held the state courts "reasonably applied  [Supreme Court]

27  precedent when they determined that there was no 'reasonable likelihood' that the prosecutor's closing

28  argument caused [the] jury to apply the instruction" in an unconstitutional manner.  <u>Id</u>.  Taylor's

1  challenges to the adequacy of his defense theory instruction and the effect of the prosecutor's argument

2  discussing that instruction similarly fall short of warranting federal habeas relief.

3      In its thorough review of this claim on appeal, the state court did not cite any federal authority,

4  nor did it reach any prejudice analysis because it concluded no instructional error had occurred, a

5  result not disturbed by the California Supreme Court in summarily denying the Petition For Review.

6  (Lodg. 7, pp. 5-15; Lodg. 8.)  Regardless of the review standard applied by the state courts, if any,

7  federal habeas courts apply the <u>Brecht</u> harmless error standard in reviewing a state courts'

8  constitutional errors, including alleged instructional error.[7]  *See* <u>Baines</u>, 204 F.3d at 977; *see also*

9  <u>Chambers v. McDaniel</u>, 549 F.3d 1191, 1200 (2008) (even if an instruction so infected the entire trial

10 that constitutional error occurred, the petitioner "is not entitled to relief unless he can show that 'the

11 error had substantial and injurious effect or influence in determining the jury's verdict' "), *quoting*

12 <u>Brecht</u>, 507 U.S. at 637; <u>Byrd v. Lewis</u>, 566 F.3d 855, 860 (9th Cir. 2009) (same).

13     Federal habeas relief is unavailable simply because a jury instruction may have been deficient

14 under state law or because the trial court may have incorrectly interpreted California's evidentiary

15 rules.  <u>Estelle</u>, 502 U.S. at 68 (federal courts may not "reexamine state-court determinations on state-

16 law questions"); <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) (federal habeas courts are bound by a

17 state court's interpretation of state law).  Moreover, a single jury instruction " 'may not be judged in

18 artificial isolation,' but must be considered in the context of the instructions as a whole and the trial

19 record."  <u>Estelle</u>, 502 U.S. at 72 ( *quoting* <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973)); *see*

20 <u>Chambers</u>, 549 F.3d at 1200 (granting federal habeas relief on grounds a deficient first-degree murder

21 instruction relieved the prosecution of its obligation to prove both deliberation and premeditation

22 where the evidence was not so great as to preclude a second-degree murder verdict).  Relief is

23 warranted only if there is "reasonable likelihood" the jury was actually led to an unconstitutional result

24 due to the instructional error.  <u>Estelle</u>, 502 U.S. at 73, n.4, *quoting* <u>Boyde v. California</u>, 494 U.S. 370,

25 379-80, 381-83 (1990).

26

---

27     [7] Taylor contended on direct appeal that <u>Chapman v. California</u>, 386 U.S. 18 (1967) should supply the
standard of review for his instructional error claim (*i.e.*, error occurred and mandates reversal unless respondent
28 establishes that the error was harmless beyond a reasonable doubt), although he also argued under "any
standard" the error was not harmless.  (Lodg. 2, p. 22; Lodg. 8, p. 20.)

Taylor's defense to the theft crimes was that he did not know the gas card belonged to National, but rather believed that the card was Barnhart's and that Barnhart had the right to give him the card for his own use.  Both sides agreed to the giving of CALJIC No. 4.35, "Ignorance Or Mistake Of Fact." (Lodg. 18, RT Vol. 2, 169:1-170:5.)  Taylor's counsel also proposed  a  "Theft: Good Faith Belief In Consent" instruction to "pinpoint" the defense theory:

> If one takes personal property of another with the good faith belief that he has permission to take the property, he is not guilty of theft.  This is the case even if such good faith belief is unreasonable.  The prosecutor must prove beyond a reasonable doubt that the defendant did not so believe for you to convict the defendant of theft.

(Lodg. 1, CT Vol. 1, p. 52.)

Defense counsel argued for inclusion of that instruction on grounds the language would permit the jury to find Taylor's "state of mind precluded a finding of theft," citing state sources in support of the proposed language.  (Lodg.  18, Vol. 1, pp. 160-161.)  The trial court decided it would "give a modified version" to avoid sounding "argumentative," retaining the "good faith belief" element requested, and adding the phrase "from the owner" to modify the word "permission." ((Lodg. 18, RT Vol. 2, 168:14-22, 244:21-28.)  The modified instruction was given in a sentence preceding the CALJIC No. 4.35, "Ignorance Or Mistake Of Fact," instruction.  (Id., 168:24-169:5.)

> If one takes personal property of anther with a good faith belief that he has permission from the owner to take the property, he is not guilty of theft.
>
> An act committed or an omission made in ignorance or by reason of a mistake of fact which disproves any criminal intent is not a crime.
>
> Thus a person is not guilty of a crime if he commits an act or omits to act under an actual belief in the existence of certain facts and circumstances which, if true, would make the act or omission lawful.

(Lodg. 18, RT Vol. 2, 289:20-290:2; Lodg. 1, CT Vol. 1, pp. 77, 119.)

On direct appeal, Taylor argued the jury could have understood the phrase "from the owner" to mean he had a mistake of fact defense only if he had a good faith belief that National -- the actual owner of the card -- had given him permission to use it.  (Lodg. 2, pp. 20-21.)  He also argued the jury likely misinterpreted the instruction due to the prosecutor's representations during closing argument that Taylor had no mistake of fact defense because he knew Barnhart did not own National, National

owned the gas card, and thus the true owner of the card had not given him permission to use it.  (<u>Id.</u>)
The Court of Appeal first found counsel's failure to object to the prosecutor's argument  at trial and
to request an admonition regarding his purported misstatement of the law foreclosed appellate review
of that issue.  (Lodg. 7, p. 13); <i>see</i> <u>Boyde</u>, 494 U.S. at 385, 384 ("Arguments of counsel which
misstate the law are subject to objection and to correction by the court" and, "like the instructions of
the court, must be judged in the context in which they are made").  The court further found any
ambiguity in the prosecutor's closing argument that Taylor knew Barnhart "wasn't the owner" -- <i>i.e.</i>,
whether he meant Taylor knew Barnhart was not the owner of the company or was not the owner of
the gas card – was offset by the instruction that the jury must follow the law as given by the court.
Counsel's summations and questions to witnesses "are usually billed in advance to the jury as matters
of argument, not evidence," and "generally carry less weight" than the court's instructions.  <u>Boyde</u>,
494 U.S. at 384.  Taylor's jury received the instruction: "What the attorneys say is not evidence."
(Lodg.  18, RT Vol. 2, 296:6-11).

The Court of Appeal also concluded even if it were to reach the merits of the claim, it would
find no error.  (Lodg. 7, pp. 12-15.)  The court examined the jury charge context, in particular the
government's burden of proof instruction (CALJIC No. 2.90) and two instructions defining the
elements of larceny and the specific intent required for a petty theft conviction (CALJIC Nos. 14.02
and 14.03).  (<u>Id.</u>, pp. 7-9.)  After a thorough summary of the pertinent trial record, distinguishing
Taylor's cited authority, in reliance on California case law interpreting the required showings for CAL.
PENAL CODE § 484 convictions and a trial court's duty to instruct on defense theories, the court found
the instruction as given accurately reflected state law and properly informed the jury what it must find
in order for the mistake of fact defense to apply.  (<u>Id.</u>, pp. 5-15.)  "By inserting the phrase 'from the
owner' into the instruction, the court made explicit what was implicit in Taylor's proposed instruction
– i.e., that Taylor's mistake of fact defense applied only if he believed in good faith that Barnhart had
given him permission to use the card and believed in good faith that Barnhart was the owner of the
card."  (<u>Id.</u>, pp. 12-13:)

It is recommended the Court find the state courts' rejection of this claim was objectively
reasonable and did not violate any of Taylor's constitutional rights.  28 U.S.C. § 2254(a).  Not only

does the issue turn on a question of state law, but also his theft convictions depended primarily on the jury's determination of witness credibility, as Barnhart's and Garcia's testimony directly contradicted Taylor's version of material events surrounding his possession and use of the gas card.   The instruction did not relieve the state of its burden to prove guilt nor did it deprive Taylor of a correct statement of his defense theory.   In consideration of the entire trial record and in the context of the whole jury charge, there is no reasonable likelihood the technicality of actual (as opposed to ostensible) ownership of the gas card influenced the jury's rejection of the defense theory or that the jury would have arrived at a different verdict had they been given the pinpoint instruction as drafted by defense counsel.   Accordingly, it is recommended habeas relief on Ground Three be **DENIED**

### D.        Ground Four:  Consecutive Sentences

Taylor challenges the imposition of consecutive sentences as a violation of his "right to a jury trial and due process," citing Cunningham, 549 U.S. 270, Blakely, 542 U.S. 296, and Apprendi, 530 U.S. 466.  (Dkt No. 1, p. 9.)  Respondent contends the imposition of full-term consecutive sentences "is not a claim for which federal relief can be granted," citing the plurality opinion Oregon v. Ice, 555 U.S. 160, 129 S.Ct 711, 714-15 (2009), applying Apprendi and Blakely to find the Sixth Amendment does not preclude a state from entrusting to judges, rather than to juries, the decision whether "sentences for discrete offenses shall be served consecutively or concurrently."  (Dkt No. 5-1, 34:8-21.)

Following his conviction on all counts, defense counsel argued unsuccessfully that each of the eight gas theft incidents involved facts and circumstances in common, using the same gas card and affecting the same victim, so that they should "not be treated as totally different events" for sentencing purposes, and warranted "either concurrent or stayed" sentences.  (Lodg. 18, Vol. 6, 756:10-757:9.) The trial court sentenced Taylor to a total determinate term of 21 years, four months, reciting its reasons for imposing each particular sentence and supporting with findings its decision to order the sentences served consecutively.  (Lodg. 18, Vol. 6, 765:16-766:16; Lodg. 1, CT Vol. 2, pp. 229-231.) In its reasoned decision affirming the judgment on direct appeal, the Court of Appeal summarized:

> In imposing consecutive sentences in this case, the trial court found that the crimes were independent and planned, and that Taylor had taken advantage of a position of trust as an employee of National. [¶]  Taylor claims [that the] trial court violated his right to a jury trial

21

1                 under the federal constitution in imposing consecutive sentences based
2                 on facts not found by the jury. Taylor argues that this court "should
                hold that under the reasoning in *Cunningham*, appellant was entitled to
                concurrent sentencing absent jury factfinding beyond a reasonable
3                 doubt regarding consecutive sentencing factors."

4 (Lodg. 7, p. 15.)

5       The Court of Appeal relied on People v. Black ("Black II"), 41 Cal.4th 799, 806 (2007), *cert.*

6 *denied sub nom* Black v. California, 552 U.S. 1144 (2008), to conclude "the trial court did not violate

7 Taylor's federal constitutional right to a jury trial in imposing consecutive sentences." (Lodg. 7, pp.

8 15-16.) Black II was decided after the Cunningham Court invalidated California's DSL as a violation

9 of the defendant's right to trial by jury insofar as it authorized judges to find facts exposing a defendant

10 to an upper-term sentence within California's three-tier criminal sentencing scheme.[8] "[U]nder the

11 Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by

12 a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the

13 evidence." Cunningham, 549 U.S. at 281, *citing* Jones v. United States, 526 U.S. 227 (1999) *and*

14 Apprendi, 530 U.S. at 468-69. 471 (same, "[o]ther than the fact of a prior conviction"). "If the jury's

15 verdict alone does not authorize the sentence, if instead, the judge must find an additional fact to

16 impose the longer term, the Sixth Amendment requirement is not satisfied."[9] Cunningham, 549 U.S.

17 at 289-92, 293, *citing* Blakely, 542 U.S. at 305.

18       Distinguishing imposition of an upper-term sentence for a discrete crime from consecutive

19 service of sentences for multiple offenses committed at different times, the Black II court held "neither

20 *Cunningham* nor the relevant prior high court decisions apply to the imposition of consecutive

21

22

23 ────────────

24      [8] "In sum, California's DSL, and the rules governing its application, direct the sentencing court to start with the middle term, and to move from that term only when the court itself finds and places on the record facts – whether related to the offense or the offender – beyond the elements of the charged offense." Cunningham,

25 549 U.S. at 279.

26      [9] Because the Cunningham opinion applied the reasoning of Apprendi and Blakely to California's DSL, the Ninth Circuit has concluded it therefore announced no new constitutional rule and may be applied

27 retroactively. Butler v. Curry, 528 F.3d 624, 636 (9th Cir.), *cert. denied sub nom* Curry v. Butler, -- U.S. --, 129 S.Ct. 767 (2008). "[W]here a federal habeas petitioner's conviction became final between Blakely and

28 Cunningham, the rule in Cunningham should be retroactively applied under Teague v. Lane, 489 U.S. 288 (1989)." Chioino v. Kernan, 581 F.3d 1182, 1184 n.1 (9th Cir. 2009), *citing* Butler, 528 F.3d at 639.

10cv0177

terms."[10]  Black II, 41 Cal.4th at 806, 821.  The United States Supreme Court denied *certiorari* in that case and recently endorsed that distinction.  *See* Ice, 129 S.Ct at 716 ("twin considerations – historical practice and respect for state sovereignty – counsel against extending Apprendi's rule to the imposition of sentences for discrete crimes," because the "decision to impose sentences consecutively" is not historically within the jury function).  "Instead, specification of the regime for administering multiple sentences had long been considered the prerogative of state legislatures."  Id.  In finding no error on this issue, Taylor's Court of Appeal reached a result consistent with controlling federal authority:

> The determination whether two or more sentences should be served in this manner is a "sentencing decision made by the judge after the jury has made the factual findings necessary to subject the defendant to the statutory maximum sentence on each offense" and does not "implicate[] the defendant's right to a jury trial on facts that are the functional equivalent of elements of an offense." (*Black I, supra*, 35 Cal.4th at p. 1264.)  Accordingly, we again conclude that defendant's constitutional right to jury trial was not violated by the trial court's imposition of consecutive sentences on all three counts. (*Black II, supra*, 41 Cal.4th at 823.)

(Lodg. 7, pp. 15-16.)

As that result is not contrary to nor an unreasonable application of United States Supreme Court authority, it is recommended federal habeas relief on Ground Four be **DENIED**.  28 U.S.C. § 2254(a).

## III.   CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Michael M. Anello under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.   For all the foregoing reasons, **IT IS HEREBY**

---

[10]  In 2005, the Black I court had concluded the upper term, rather than the middle term, qualified as the relevant statutory maximum for sentencing purposes and held there is no right to jury fact-finding when a court imposes a sentence within the maximum authorized by a jury's verdict of guilt.  People v. Black ("Black I"), 35 Cal.4th 1238 (2005).  In February 2007, the United States Supreme Court vacated Black I and "remanded to the California Supreme Court for further consideration in light of" Cunningham, 549 U.S. 270. Black v. California, 549 U.S. 1190 (2007).  On remand, the Black II court applied Cunningham, but again concluded imposition of the upper term in that case did not violate the defendant's jury trial right because one legally-sufficient aggravating factor justified the upper term.  Black II, 41 Cal.4th at 813. "[I]mposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions," even if the sentencing court also engaged in additional judicial fact-finding.  Id. at 816; *see* Butler v. Curry, 528 F.3d 624, 643 (9th Cir. 2008) ("under California law, only one aggravating factor is necessary to set the upper term as the maximum sentence"

1    **RECOMMENDED** this habeas petition be **<u>DENIED</u>** in its entirety on grounds the Petitioner is not

2    in custody in violation of any federal right.  **IT IS FURTHER RECOMMENDED** the Court issue

3    an Order:  (1) approving and adopting this Report and Recommendation; and (2) directing that

4    Judgment be entered denying the Petition.

5    \\

6            **IT IS HEREBY ORDERED** no later than **<u>March 21, 2011</u>**, any party to this action may file

7    written objections with the Court and serve a copy on all parties.  The document should be captioned

8    "Objections to Report and Recommendation."

9            **IT IS FURTHER ORDERED** any Reply to the Objections shall be filed with the Court and

10   served on all parties no later than **<u>April 4, 2011</u>**.  The parties are advised that failure to file objections

11   within the specified time may waive the right to raise those objections on appeal of the Court's Order.

12   *See* <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156 (9th

13   Cir. 1991).

14

15   DATED:  March 7, 2011

16

17                                        Hon. Bernard G. Skomal
                                          U.S. Magistrate Judge
18                                        United States District Court

19

20

21

22

23

24

25

26

27

28

24

10cv0177